## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **DENIS A. RIVERA,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:14cv00573 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **SGT. J. B. DICKENSON, et al.,** | ) | By: Pamela Meade Sargent |
| Defendants | ) | United States Magistrate Judge |

 The pro se plaintiff, Denis A. Rivera, an inmate incarcerated at Red Onion State Prison, ("Red Onion"), brings this civil rights action pursuant to 42 U.S.C. § 1983, against the defendants Sgt. J. B. Dickenson and Correctional Officer S. Patrick. In his Complaint, Rivera alleges that the defendants violated his Eighth Amendment rights through the use of excessive force on him on December 28, 2012. (Docket Item No. 1, ("Complaint.")) In particular, Rivera alleges that he was assaulted by Dickenson and Patrick when, without any provocation, they struck him in the back of the head, slammed him to the floor, choked, punched, kicked, kneed and elbowed him in the head, face and ribs after he knelt in his cell to be removed from restraints. Rivera's claim is before the undersigned upon referral pursuant to 28 U.S.C. § 636(b)(1). An evidentiary hearing was held in this matter on November 5, 2015. For the reasons discussed herein, I recommend that the court enter judgment in favor of the plaintiff.

Case 7:14-cv-00573-JPJ-PMS   Document 110   Filed 02/29/16   Page 1 of 27   Pageid#: 1477

*I. Facts*

At his evidentiary hearing, Rivera testified that defendant Dickenson removed him from his cell on December 28, 2012, to take a shower. Rivera said that Dickenson went in his cell and threw Rivera's clothes on the floor. When Rivera asked why he did this, Rivera said that Dickenson responded: "Who gives a shit about your clothes?" River said that he told Dickenson that he was going to write him up, and Dickenson responded: "I don't give a f—k." Rivera stated that, as Dickenson escorted him to the shower, Dickenson was arguing with another inmate.

Rivera testified that Dickenson and Patrick placed him in handcuffs and leg irons to escort him from the shower back to his cell. Rivera said that he had a washcloth, towel and soap in his hand as he walked back to his cell. When he arrived at his cell, Rivera said, he knelt down to allow the correctional officers to remove the leg irons. Without warning, Rivera said, he felt a blow to the back of his head, and the officers slammed him to the floor of his cell, hitting the right side of his face on the floor. Rivera said that he saw Dickenson punch him, and he felt someone kick him twice. He said Dickenson also elbowed him in the back and choked him. He said Officer Dickenson forced his head to the floor, where he hit his right eye area. He said that he then felt another kick in the back and a blow to the right neck area.

On cross-examination, Rivera said that Dickenson also "kneed" him in his right leg. He denied that either officer said anything to him, before he felt the first blow to his head. Rivera stated that policy required the officers to frisk search him before removing him from the shower to return to him to his cell. He testified that

Dickenson and Patrick did not follow this policy and did not search him before removing him from the shower. He said that, if they had searched him, they would have known that all he had in his hands was his towel, washcloth and soap. Rivera stated that he did not remember if he also had his clear plastic soap dish in his hands. He did testify that some correctional officers would let inmates take their soap dishes to the shower on occasion.

Rivera said that he screamed out when he was first hit. He said that he was not sure when they took the leg shackles off, but the officers eventually picked him up from the floor, left the cell and shut the cell door. He said the officers then took off his handcuffs through the tray slot. Rivera said that he felt something running on his face and reached up and got blood on his fingers. He said that he told the officers he needed to be seen by a nurse. He said he then looked at his face in a mirror and saw cuts under his right eye. He said that he also saw scratches on his neck area where he had been choked. His said he also felt two large knots on the back of his head.

Rivera said that Sgt. Collins came to his cell and that he told Sgt. Collins that he did not want to come out of his cell while Dickenson was present. Rivera said that Collins retrieved a handheld video camera and started taking pictures of his injuries before the nurse came to his cell. Rivera also said that he complained to Lt. Gilbert of injuries to his eye and head and asked to be seen by a doctor.

Rivera said that he complained of injuries to his back, neck and waist. He said that the nurse told him that he did not see anything. He then asked the nurse, "You don't see blood coming out?" Rivera said that he asked the nurse for a cool compress and was told that it could not be provided to him because he was housed

in segregation. He said the officers removed all his property from his cell, including any washcloths that he could use to put a cool compress on his face. Rivera said that he was left in his cell dressed only in his boxer shorts and a t-shirt.

Rivera said that he could not chew food after this because his jaw was sore. He said he lost his appetite for days and suffered nightmares of being choked and beaten. He said that he still suffered from the nightmares.

Rivera said that he was seen by Nurse Stump days later, and she saw bruising on his face and referred him to be seen by a doctor. Rivera was examined by a doctor on January 10, 2013, and that doctor referred him to be seen by an eye doctor. Rivera said that he was seen by the eye doctor in February 2013. He said that he told the eye doctor that he suffered from blurred vision and twitching in his eye. He also said that he told the eye doctor that he was assaulted by correctional officers. He said that the eye doctor prescribed eye drops and tinted eyeglasses.

Rivera submitted the Affidavit of Nurse S. Scott into evidence as Plaintiff's Exhibit #1. (Docket Item No. 98-2.) According to this affidavit, Scott said that he examined Rivera on December 28, 2012, after "he had been placed on the floor." Scott stated that Rivera complained about his head, eye and wrist. Scott said that Rivera had a small knot of approximately 2 centimeters in diameter on the left side of the back of his head. Scott also noted a small abrasion of about 1 centimeter in diameter to the edge of Rivera's right eyebrow. Scott said that he observed no bleeding, redness or swelling of Rivera's face near the abrasion. He said that he also observed a small abrasion on Rivera's right wrist where the cuff touched it. Scott stated that Rivera had a full range of motion in his wrist without any indication of pain. According to Scott's affidavit, he instructed Rivera to use a cool

-4-

compress on the knot on the back of his head as needed and to clean his abrasions with soap and water.

Rivera testified that he filed an informal complaint and grievance regarding the incident and that he requested that any video recordings be preserved. He also testified that he requested that the video evidence be reviewed on appeal of the grievance decision. In an Informal Complaint form filed by Rivera on January 3, 2013, Rivera stated that he was "physically assaulted" by Dickenson and that Patrick "slammed [his] face and head onto the concrete floor." (Plaintiff's Exhibit No. 10, Docket Item No. 98-10.) This form makes no reference to video recordings or preserving video recordings.

Rivera filed a Regular Grievance form on January 17, 2013, on which he stated that he was "physically assault[ed]" by Dickenson and that Patrick "slammed [his] face and head on the concrete floor." (Plaintiff's Exhibit No. 10, Docket Item No. 98-10.) Rivera claimed that other inmates in the shower witnessed this assault. When Rivera's Regular Grievance was returned as unfounded, he appealed the decision. In this appeal, Rivera stated that he was "viciously assault[ed]" by Dickenson and Patrick. This appeal mentions "pictures" taken by Sgt. Collins, but no video evidence. This appeal also states that other inmates in the shower witnessed this assault.

Rivera also submitted into evidence a February 25, 2013, Memorandum from Red Onion Warden R. C. Mathena regarding Rivera's appeal of his conviction for assaulting an officer by grabbing Dickenson's arm on December 28, 2012. (Plaintiff's Exhibit No. 35, Docket Item No. 98-36.) This Memorandum noted that any inmates who remained in the showers at the time of the alleged

-5-

assault on December 28 could not have seen what happened in Rivera's cell because his cell was on the top tier of the pod. This Memorandum also noted that the C-2 pod video recording for December 28 had been reviewed, but it did not show the incident at issue because it occurred inside Rivera's cell.

Rivera also submitted into evidence Documentary Evidence Request Forms he completed on December 30, 2012, requesting that the photographs Sgt. Collins made of him immediately after the December 28, 2012, incident and the video recording made in the C-2 building on December 28 be made available to use at his disciplinary offense hearing on his charge of assaulting Dickenson. (Plaintiff's Exhibit Nos. 39, 40, Docket Item Nos. 98-40, -41.)

Rivera submitted into evidence an Internal Incident Report completed by Dickenson and approved by Lt. Christopher C. Gilbert on December 28, 2012. (Plaintiff's Exhibit No. 41, Docket Item No. 98-42.) On this form the Description of Incident states:

> On Friday December 28, 2012 I Officer J. Dickenson and Officer S. Patrick were escorting D. Rivera … from the shower in C-2. I noticed the offender had a large plastic bag folded up in his hand, I asked the offender several times to give me the bag to which he did not comply. Once at the offenders cell he knelt down to have the leg restraints removed, I asked the offender several more times to give me the bag but, he sill refused to do so. When I went to retrieve the bag from his hand he turned and grabbed my wrist. At this point myself and Officer Patrick placed the offender on the floor to maintain control. After retrieving the bag the offender was ordered to come back to the kneeling position to which he complied and the restraints were removed with no further incident. Sgt. L. Collins was notified and Nurse S. Scott assessed the offender. A small scratch on his right eyebrow, a scratch on his right hand, and a dime sized knot on the

-6-

back left side of his head were noted. Still photos were taken. Offender Rivera was placed on strip cell. No injuries to staff to report at this time.

Rivera submitted a number of medical records into evidence. Included among this evidence was a Nursing Evaluation Tool form dated January 1, 2013. (Plaintiff's Exhibit No. 3, Docket Item No. 98-3.) According to this form, a nurse saw Rivera on January 1, 2013, for complaints of headache, blurred vision, seeing flashes of light, nausea, memory loss, difficulty concentrating and dark spots on his skin. This nurse noted a small bruise on Rivera's right hip, a bruise on right eye and cheekbone area, peeling skin on Rivera's cheek bone area and scaling skin on both wrists. It was noted that Rivera stated that his symptoms began on the previous Friday, which would have been December 28, 2012. This note also states that Rivera was referred to and seen by a doctor on January 3, 2013, who prescribed hydrocortisone cream, Tylenol and Motrin for him.

Rivera also submitted into evidence a medical note made by Dr. D. Miller, who examined him on January 10, 2013. (Plaintiff's Exhibit No. 4, Docket Item No. 98-4.) According to Dr. Miller's note, Rivera complained of headaches accompanied by blurred vision since he was "taken down by officers" on December 28, 2012. Rivera also complained of pain in his head when he chewed, nausea and vomiting and memory problems. Dr. Miller noted that Rivera might have suffered a minor concussion based on his history, but not based on his examination. He prescribed Tylenol and referred Rivera to an eye doctor for his complaints of blurred vision.

Rivera also submitted into evidence a medical note made by Dr. D. Miller based on a January 29, 2013, examination of Rivera. (Plaintiff's Exhibit No. 4,

Docket Item No. 98-4.) According to this note, Rivera continued to complain of headaches brought on by light. He also complained of blurred vision, nausea and trouble with his memory. According to a March 5, 2013, medical note, Rivera continued to complain of suffering from headaches and trouble with his memory. He was referred to the mental health department for memory testing.

Rivera also submitted into evidence a report from an optometrist, who examined his vision on February 6, 2013. (Plaintiff's Exhibit No. 15, Docket Item No. 98-15.) The optometrist noted that Rivera complained of headaches and having to squint his eyes to see far away. The optometrist found Rivera to have 20/100 vision in his left eye and 20/80 vision in his right eye, and prescribed eyeglasses for him. The optometrist stated that Rivera's headaches might have been due to his uncorrected vision problem. Rivera saw the optometrist again on October 16, 2013. (Plaintiff's Exhibit No. 28, Docket Item No. 98-28-1.) On this occasion, Rivera complained of his right lower eyelid twitching and blurred vision in his right eye. The optometrist noted that Rivera's corrected vision was 20/25 in both eyes. He noted that the eyelid twitching might be secondary to nerve irritation, and he prescribed eye drops. On November 6, 2013, Rivera reported that the eyelid twitching was a "little better."

Rivera saw the optometrist again on August 20, 2014, for follow up of complaints of eyelid twitching. (Plaintiff's Exhibit No. 15, Docket Item No. 98-15.) According to the report, Rivera reported that the twitching had improved with the use of prescribed drops. Rivera also said that he thought bright light triggered the episodes of twitching. The optometrist noted that his examination showed that the twitching had improved, but had not resolved. The optometrist noted that he

-8-

told Rivera that he could not use steroidal eye drops long-term. The note reflects that the optometrist ordered tinted lenses for Rivera's eyeglasses.

Rivera testified that he never was charged with any disciplinary offense for possession of contraband.

Rivera claims that Dickenson has continued to retaliate against him for filing this claim against Dickenson. In particular, Rivera submitted into evidence an Informal Complaint, Regular Grievance and appeal to the regional ombudsman regarding an allegation that Dickenson sexually harassed him on July 30, 2015, by telling him to "suck my dick, Rivera." (Plaintiff's Exhibit No. 48, Docket Item No. 98-49.)

Inmate Michael Isaiah Lawrence testified that he was housed in cell C-321 at Red Onion on April 13, 2015, when he saw and overheard Dickenson threaten Rivera as Dickenson passed out legal mail between 9 to 10 p.m. that evening. Lawrence stated that Rivera was housed in cell C-320 on that day. Lawrence said that he heard Dickenson say to Rivera that "once the case is over" he was going to get a group together and "f—k you up." Lawrence said Dickenson told Rivera that he "had that coming" to him. Lawrence said that Rivera responded: "What are you talking about? I have never disrespected you. You are disrespecting me."

Rivera submitted into evidence an affidavit signed by Lawrence on April 15, 2015. (Plaintiff's Exhibit No. 29, Docket Item No. 98-30.) In this affidavit, Lawrence stated that, on April 13, 2015, at 10:12 p.m., he heard Dickenson tell Rivera, who was housed in the adjacent cell, that Dickenson could not wait for Rivera's "lawsuit to be over with so he could beat his ass again." Lawrence stated

that Rivera asked Dickenson what he was talking about, and Dickenson responded, "you know what the f—k I am talking about, it's going to be worst next time!"

Rivera also submitted into evidence Informal Complaint and Offender Request for services forms, which he claims that he filed with regard to this alleged threat by Dickenson. (Plaintiff's Exhibit No. 29, Docket Item No. 98-30.) On these forms, Rivera stated that Dickenson told him that Dickenson could not wait until this lawsuit was over so he could beat Rivera's "ass" again.

Inmate Lee Boyd Malvo testified that he was housed in cell C-204 at Red Onion on December 28, 2012. Malvo said that heard the defendants tell Rivera "We are going to f—k you" as they escorted him back to his cell from the shower. Malvo said that Rivera and the defendants walked up the stairs to the second tier where Rivera was housed. Malvo said that Rivera had only a towel and "regular shower stuff" in his hand. Malvo said that after Rivera and the defendants walked up the stairs, he heard something hit the floor, and he heard Rivera scream. He said that he did not see what occurred in Rivera's cell because his cell was on the bottom tier, and Rivera's was on the top tier. On cross-examination, Malvo admitted that, whatever Rivera had in his hands, was wrapped up in a towel. Malvo said that he saw a towel and washcloth in Rivera's hand and what he assumed was a soap dish wrapped up in the towel.

Stuart Scott, a nurse at Red Onion, testified that he assessed Rivera outside of his cell on December 28, 2012. Scott said that Rivera complained of injuries to his head, right eyebrow area and wrist. Scott stated that he observed an abrasion to Rivera's right eyebrow area and noted it in his medical report. Scott said he also observed a small knot on the left back of Rivera's head, about 2 centimeters in

diameter. Scott said that Rivera made no complaint of injury to his back. Scott testified that he instructed Rivera to wash the abrasion with soap and water and to place a cool compress to the knot on his head. Scott said he did not refer Rivera to be seen by a physician. Scott stated that he did not recall what Rivera was wearing and did not recall if officers were taking Rivera's property from his cell as he was assessing him.

Scott testified that he made the medical note admitted as Defendant's Exhibit No. 1 within a few minutes after assessing Rivera on December 28, 2012. (Docket Item No. 98-1.) Scott's note stated "inmate had been placed on floor." The note stated that Rivera complained of injuries to his head, eye and wrist. Scott said that he noted no bleeding or swelling of Rivera's eyebrow. He also noted a small abrasion on Rivera's right wrist where the handcuffs were. The note also stated that Rivera had a "small knot approx. 2 cm in diameter [on] left side of back of head." He said, based on his note, Rivera was oriented and made no complaint of injury to his torso, back or waist. He said that he did not observe any bleeding or any bruises. Scott said that he observed that Rivera had full range of motion in his hand and wrist.

James Richard Wiandt also testified at the evidentiary hearing. Wiandt, who is retired from the VDOC, was Master Special Investigator at Red Onion on January 4, 2013. Wiandt stated that he did not recognize Rivera and did not recall ever speaking with Rivera about this or any other prisoner's case on January 4, 2013, or otherwise. Wiandt said he did not recall ever seeing any visible signs of injury on Rivera. He also stated that he did not conduct any investigation of the December 28, 2012, incident at issue in this case.

Defendant Dickenson testified that, on December 28, 2012, he worked as a correctional officer at Red Onion. He said that he subsequently was promoted to the position of correctional sergeant. Dickenson testified that Rivera was housed in the C-2 segregation pod at Red Onion in cell 216 on December 28. Dickenson said that he and Patrick pulled Rivera, along with other inmates in that pod, to go to the showers on that day. Dickenson stated that each inmate was strip searched before leaving his cell. After each inmate stripped, he placed his clothes and any items he was taking to the shower in the security box on his cell door. The officers would search the items, and then allow the inmate to dress, restrain him and remove him from the cell.

Dickenson said that inmates possess clear plastic soap dishes about 4.5 by 2 by 2 inches in dimensions, but he said that inmates were not allowed to take these soap dishes to the shower with them.

Dickenson said that he and Patrick searched and escorted Rivera to the shower that day without incident. Dickenson said that the officers performed a visual inspection of the shower, placed Rivera in the shower and removed the restraints from him. Dickenson said that the only thing that should have been in the shower, when they placed Rivera in the shower, was a plastic mat on the floor. He said that he did not lift up the mat to see if there was anything under the mat.

Dickenson agreed that Rivera must have given his clothing to the officers to inspect prior to leaving his cell, but he also testified that he did not recall throwing Rivera's clothes in the floor. In fact, he stated that he could not recall if either officer entered Rivera's cell when they retrieved him to take him to the shower. Dickenson testified that he did not make any comments to Rivera as he escorted

him to the shower. He specifically denied that he told Rivera, "I don't give a shit about your clothes."

Dickenson said that an inmate is allowed 15 minutes in the shower. He said the officers would return to remove the inmate from the shower within 15 to 20 minutes of placing him in the shower. Dickenson said that he did not remain in the shower area while Rivera was in the shower on that day. He specifically denied that he argued with another inmate while Rivera was in the shower. In fact, he said that he could not remember if there was an inmate in the other shower stall while Rivera was in the shower.

Dickenson testified that he and Patrick removed Rivera from the shower to return him to his cell. He stated that they placed the handcuffs and leg irons on Rivera before unlocking the shower door to remove him from the shower. Dickenson stated that officers could see and access an inmate's wrists and parts of their arms and torso through a tray slot in the shower's plexiglass door. On direct, Dickenson testified that he did not recall whether he or Patrick placed the handcuffs on Rivera before removing him from the shower on December 28.

Dickenson said that Rivera's hands were cuffed behind him as they escorted him to his cell. On direct, Dickenson testified that he and Patrick were escorting Rivera back to his cell when he noticed a plastic bag wadded up in Rivera's hand. He said that it appeared to be a large clear plastic trash bag. He also said that inmates at Red Onion are not allowed to possess plastic bags. Dickenson said that he told Rivera, "You know you are going to have to give that to us." Dickenson said that he told Rivera to give him the bag two to three times before they climbed the steps to Rivera's cell on the top tier. He stated that Rivera did not release the

-13-

bag and that they continued to escort him to his cell. Dickenson said that, at this point, he and Patrick were about one step away, on opposite sides of Rivera, with each having one hand on Rivera's shoulder and their other hand on the bend of Rivera's arm. He said that he did not remember who was on which side of Rivera.

When they arrived at Rivera's cell, Dickenson said, Rivera got down in a kneeling position to allow the officers to remove his leg irons. Dickenson said that he again asked Rivera several times to give him the bag. Dickenson testified that, as he reached to grab the bag from Rivera's hand, Rivera turned and grabbed his left wrist. Dickenson said that he reached up with his right hand and pushed Rivera to the ground to maintain control of him. Dickenson said that he then laid on Rivera's back while Patrick controlled his legs. Dickenson specifically testified that he did not punch, elbow, kick, choke or slam Rivera or his head to the floor. Dickenson said that he did not say anything to Rivera after he placed him on the floor. Dickenson testified that, after the incident, he observed a small red mark above one of Rivera's eyes. Dickenson stated that photographs were taken of Rivera after the incident. Dickenson testified that the incident would not have been captured by Red Onion's rapid eye video recording because it happened inside Rivera's cell.

Dickenson said that, after this incident, the bag, which was a large trash bag, was lying on the top tier floor. Dickenson conceded that he did not place a disciplinary charge against Rivera for possession of contraband, but, instead, he charged Rivera with simple assault on a nonoffender for grabbing his arm. Rivera submitted Dickenson's Disciplinary Offense Report into evidence as Plaintiff's Exhibit No. 54. (Docket Item No. 98-55.) On this Report, Dickenson wrote:

On Friday December 28, 2012[,] I[,] Officer J. Dickenson and Officer S. Patrick were escorting Offender D. Rivera … in C-2 … when I noticed the offender had a large bag folded in his hand. I asked the offender to give me the bag to which he refused. Once at the … offender[']s cell he knelt down to remove the restraints, I asked the offender several more times to give me the bag to which he refused, as I went to retrieve the bag from his hand the offender turned and grabbed my wrist. The offender was placed on the floor to maintain control.

(Docket Item No. 98-55.) Dickenson stated that Lt. C. Gilbert approved the charge against Rivera. He also conceded that this Report did not indicate that any investigation was ever done of the allegations.

Dickenson specifically denied that he told Rivera "We are going to f—k you up" as he escorted him back to his cell from the shower. Dickenson testified that he did not assault Rivera and did not use excessive force on Rivera during this incident. Dickenson stated that, as a correctional officer at Red Onion, he was trained in procedures to be employed to control offenders, and he participated in that training one or two times a year.

Dickenson also specifically denied that he threatened Rivera on April 13, 2015, by telling him, "When this case is over, I will f—k you up." He denied that he ever threatened to get a group of officers together to attack Rivera. Dickenson said that he did not recall Rivera trying to give him an Emergency Grievance on April 13, 2015, but, if Rivera did, he said that he would have answered it. Dickenson also denied that he told Rivera he could not wait for Rivera's "lawsuit to be over with so he could beat his ass again."

Dickenson testified that he had used force in the form of OC pepper spray on witness Lawrence about two years earlier. Dickenson said that he used the spray to prevent Lawrence from using a shoe to break the sprinkler head in his cell.

Dickenson also specifically denied that he told Rivera, "suck my dick" on July 30, 2015. He said, "I have never told him that."

Dickenson stated that Plaintiff's Exhibit No. 41, (Docket Item No. 98-42), was a copy of the Incident Report he prepared regarding his use of force on Rivera on December 28, 2012, except that he did not place the handwriting, arrows or underlining on the report. Dickenson testified that the information he entered on the report was accurate and consistent with his testimony. Rivera also submitted an affidavit from Dickenson into evidence as Plaintiff's Exhibit No. 53. (Docket Item No. 98-54.) Dickenson's statements in this affidavit are consistent with his oral testimony.

Rivera submitted VDOC Operating Procedure 861.3 regarding Special Housing into evidence as Plaintiff's Exhibit No 32. (Docket Item No. 98-33.) Dickenson admitted that he was familiar with Operating Procedure 861.3, and he agreed that this Operating Procedure required officers to frisk search an offender before returning him to a Special Housing Unit or segregation cell. Operating Procedure 861.3 states in relevant part: "A frisk search shall be conducted prior to returning the offender to a Special Housing Unit cell." Dickenson conceded that he did not remember doing a frisk search of Rivera before removing him from the shower to return to his cell. As on direct, at one point during his cross-examination, Dickenson stated that he did not recall who put the cuffs on Rivera's wrists before removing Rivera from the shower. At another point, however, Dickenson said that

-16-

he believed he did not conduct the frisk search of Rivera because he got "sidetracked" when he saw the bag in Rivera's hand as he was putting the handcuffs on him.

Defendant Stephen Patrick testified that he also escorted Rivera to and from the shower on December 28, 2012. Patrick stated that Dickenson noticed that Rivera had a plastic bag in his hand as they were escorting Rivera to his cell. Patrick said that he noticed the bag after Dickenson asked Rivera to give up the bag. Patrick said that he could see the bag in Rivera's hand as they escorted him back to his cell, but he said that he could not remember how Rivera was holding the bag.

Patrick testified that he did not see the plastic bag when they stripped searched Rivera before taking him to the shower. He said that he did not remember either himself or Dickenson doing a walkthrough of Rivera's cell before they took him to the shower. He also testified that he did not hear Rivera ask why his clothes had been knocked on the floor. Patrick said that he did not hear Rivera threaten to write Dickenson up and that he did not hear Dickenson say, "I don't give a f—k" to Rivera.

Patrick admitted that the prison's procedures required an offender to be frisk searched before being returned to a segregation cell, but he said that he and Dickenson did not frisk search Rivera when they took him from the shower.

Patrick admitted that he could not remember which side of Rivera he was on as he escorted Rivera back to his cell that day. He said that he walked about one-half step behind Rivera with one hand on Rivera's shoulder and one hand on the

bend of Rivera's arm. Patrick said that, when they arrived at Rivera's cell, Rivera knelt down with his ankles outside of the cell door. He said that Officer Dickenson asked Rivera to give up the bag. Patrick said that he did not say anything to Rivera about the bag. Patrick testified that Dickenson reached for the bag, and Rivera grabbed Dickenson. He said that Dickenson placed Rivera on the floor and was on top of him with his chest against Rivera's back. Patrick said that he maintained control of Rivera's legs by placing the weight of his body on Rivera's calves below the knee area. Patrick said that the bag was taken from Rivera once he was placed on the floor.

Patrick denied that he kicked, hit, punched, elbowed or slammed Rivera's body or face to the floor. He specifically denied that he hit Rivera in his back. Patrick also denied that he told Rivera they were going to "f—k him up." Patrick testified that he did not use excessive force against Rivera and that he did not assault Rivera. Patrick said that he did not see Dickenson hit, choke, punch or knee Rivera. Patrick conceded that, because Rivera's ankles were located outside of his cell door when he kneeled down, the prison's rapid eye surveillance video recording might have captured him on top of Rivera's legs after they placed Rivera on the floor.

Patrick testified that Sgt. Collins came to the cell and asked Rivera if he was going to continue to assault staff or be disruptive. Patrick said that Rivera told Collins "no," and Collins told them to get Rivera up from the floor. Patrick said that the restraints were removed from Rivera without further incident after the nurse assessed him. Patrick testified that he did not see any cuts, blood or bruises on Rivera that day. He did say that he saw an abrasion on Rivera's eyebrow after this incident. He said that Collins took photographs of Rivera after the incident.

Patrick testified that he completed an Internal Incident Report regarding the use of force against Rivera, which was admitted into evidence as Plaintiff's Exhibit No. 42. (Docket Item No. 98-43.) Patrick said that the arrows and underlining on this exhibit were not done by him. On this Report, Patrick wrote:

> On Friday December 28, 2012, I[,] Officer Patrick and Officer Dickenson [were] escorting offender D. Rivera from the shower to his assigned cell. Officer Dickenson noticed that he had a plastic bag folded up in his hand and Officer Dickenson ask[ed] the offender several times to give him the bag which the offender refused to respond. When we arrived at offender[']s cell the offender kneeled down on his knees to have the leg restraints removed. Officer Dickenson ask[ed] offender several more times to give up the bag and offender refused. Officer Dickenson reached down to retrieve the bag from the offender and the offender then turned and grabbed Officer Dickenson[']s left wrist, the offender then was placed on the floor to maintain control of the offender. Once on the floor the bag was removed from the offender. The restraints were removed without further incident. Sgt. Collins was notified and Nurse S. Scott came to assess the offender no treatment was needed.

(Docket Item No. 98-43.) Patrick conceded that his Report stated that no investigation of the incident was done.

An Affidavit by Patrick was admitted into evidence as Plaintiff's Exhibit No. 55. (Docket Item No. 98-56.) In this Affidavit, Patrick stated:

> On the morning of December 28, 2012, Officer Dickenson and I were assisting with offender showers in the C-2 pod. ... Dickenson and I went to the shower to escort Rivera [back] to his cell. We placed Rivera in restraints including leg irons and handcuffs with his hands cuffed behind his back and brought him out of the shower. Dickenson and I escorted Rivera back to his cell. He entered the cell and kneeled on the floor facing the back of the cell in accordance with security

-19-

procedures. Officer Dickenson noticed that Rivera had a bag in his hands, and gave Rivera several orders to hand over the bag, but Rivera refused. As Rivera was kneeling, still fully restrained, Dickenson reached down to take the bag from Rivera's hands. Rivera grabbed Dickenson's wrist and tried to get up. In order to maintain control of Rivera, Dickenson and I placed him on the floor. Sergeant Collins was notified and we held Rivera on the floor until the Sergeant arrived at the cell. Sergeant Collins instructed us to bring Rivera up from the floor, and the Sergeant talked with Rivera and asked him if he had any injuries. Based on my recollection, Rivera refused medical treatment. …

At no time did I punch or kick Rivera, nor did I see Officer Dickenson punch or kick Rivera. Rivera was aggressive and grabbed Dickenson's arm which required that we place him on the floor. Only the necessary force was used to control Rivera.

(Docket Item No. 98-56.) Patrick conceded that Nurse Scott did come to Rivera's cell to assess him. He also conceded that Nurse Scott did not testify that Rivera refused any medical treatment. According to Patrick, "when I say 'treatment refused,' I mean he did not go back to medical."

## II. Analysis

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian*, 503 U.S. 1, 5 (1992). The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of

inmates. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).

"Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams*, 77 F.3d at 761. Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *See Hudson*, 503 U.S. at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). In a claim for excessive application of force, a claimant must meet a heavy burden to satisfy the subjective component. *See Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). Specifically, he must show that the prison official applied force "maliciously and sadistically for the very purpose of causing harm" rather than in a good faith effort to maintain or restore discipline. *Whitley*, 475 U.S. at 320-21 (internal quotation marks omitted). To satisfy the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). In an excessive force claim, that state of mind is "wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322. In determining whether a prison official has acted with "wantonness," courts may consider the following factors:

1) The need for application of force;

2) The relationship between that need and the amount of force used;

3) The threat "reasonably perceived by the responsible officials;" and

4) "any efforts made to temper the severity of a forceful response."

-21-

*Williams,* 77 F.3d at 762 (citing *Whitley,* 475 U.S. at 321). "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321. While the court must afford deference to prison administrators' "discretion" regarding necessary measures to maintain security, that discretion "does not insulate from review actions taken in bad faith and for no legitimate purpose." *Whitley*, 475 U.S. at 322. If "the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain," and it presents a factual issue as to whether the force was nontrivial, the case must go to trial. *Whitley*, 475 U.S. at 322.

The objective component of an excessive force claim is not as demanding, however, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated[,] whether or not significant injury is evident." *Hudson*, 503 U.S. at 9. Instead, an inmate must show that the force used was "nontrivial." *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010). "This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7). In fact, the extent of the injury may suggest "'whether the use of force could plausibly have been thought necessary' in a particular situation" or "provide some indication of the amount of force applied." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7). For example, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins*, 559 U.S. at 38 (quoting *Johnson*, 481 F.2d at 1033). As *Wilkins* clarified, it is the nature of the force "that ultimately counts"

-22-

and provides the "core judicial inquiry" in an excessive force case. 559 U.S. at 37, 38.

Furthermore, the plaintiff in a § 1983 claim has the burden of proof. *See Oliver v. Powell*, 250 F. Supp. 2d 593, 598 (E.D. Va. 2002). Also, no damages may be awarded absent proof of injury. *See Bernadou v. Purnell*, 836 F. Supp. 319, 326 (D. Md. 1993).

In this case, Rivera claims that he was hit in the head, slammed to the floor, punched, kicked, choked and kneed by Dickenson and Patrick on December 28, 2012, for no reason. Both Dickenson and Patrick have admitted that they did use force against Rivera on this date to place him on the floor of his cell in an effort to control him after he grabbed Dickenson's wrist. As in so many of these cases, the court's decision in this case turns on the credibility of the parties. If Rivera's testimony is believed, he was violently assaulted by the defendants without cause, which, under the above-outlined law, would be an application of excessive force for which the defendants should be held liable. If the defendants' testimony is believed, they used only that force necessary to maintain control of Rivera after he grabbed Dickenson's wrist when Dickenson attempted to retrieve the plastic bag from Rivera.

In determining the credibility of the parties, the court may consider, among other things, the consistency of the parties' testimony and whether the objective evidence supports their testimony. In this case, I am persuaded that the inconsistencies in the defendants' testimony, as well as the objective medical evidence of injury, support the plaintiff's version of events. Particularly persuasive is the objective medical evidence offered through Nurse Scott's testimony and his

medical report that noted that Rivera had a 2 centimeter in diameter knot on the left back of Rivera's head. If Rivera had been simply "placed on the floor" as described by the defendants, there would be no explanation for this injury. To the contrary, this injury supports Rivera's testimony that he was struck in the head without reason.

The inconsistencies in the defendants' testimony also persuades the court that the defendants' use of force against Rivera on December 28, 2012, was unnecessary and, therefore, excessive. In particular, Dickenson's testimony, itself, was inconsistent regarding when he claimed that he noticed a plastic bag in Rivera's hand. During his direct testimony and, again, initially, on cross-examination, Dickenson testified that he did not remember whether he or Patrick placed the handcuffs on Rivera before removing him from the shower and that he first noticed a plastic bag in Rivera's hand as they were escorting Rivera back to his cell. Dickenson's testimony on this point changed, however, after Dickenson was forced to concede on cross-examination that he and Patrick did not frisk search Rivera before returning him to his segregation cell as required by DOC Operating Procedure 861.3. At this point, Dickenson claimed he forgot to search Rivera because he got "sidetracked" when he saw the bag in Rivera's hand as he was putting the handcuffs on Rivera.

Patrick, in his testimony, said that he saw the bag in Rivera's hand only after Dickenson told Rivera to surrender the bag as they escorted him back to his cell. In his affidavit, however, Patrick stated that Dickenson noticed Rivera had a bag in his hands only after they returned Rivera to his cell and he kneeled down to have his restraints removed.

The court further finds it incredible that the defendants would have returned the defendant to his cell without searching him more fully, if they had seen that he possessed contraband. Also, the court finds it odd that Rivera was not charged with a disciplinary infraction for possessing contraband and that the bag at issue was not preserved, or at least a photograph of it preserved, and offered into evidence. Furthermore, despite Rivera's repeated requests for the defendants to produce the photographs taken of him on December 28, they did not produce this evidence and offered no reasonable explanation for not doing so, other than to say that they were not responsible for preserving the evidence. While that may be the case, the reality is that this evidence was not produced to refute Rivera's claims of his injuries.

For these reasons, I find that the defendants, at the very least, struck Rivera in the head and pushed him to the floor of his cell for no reason. Rivera has not, however, persuaded me that the defendants repeatedly kicked, punched and kneed him while he was lying on the ground, in that the minor physical injuries observed by Scott do not support such a beating.

Rivera also has not presented any medical evidence that his continuing problems with his headaches or his right eye were caused by the defendants' use of excessive force on him. In particular, the medical evidence presented by Rivera shows that his eye problems were more likely due to his uncorrected poor vision in both eyes. (Plaintiff's Exhibit No. 15, Docket Item No. 98-15.) The uncontradicted medical evidence shows that Rivera suffered fairly minor injuries of a knot on his head, an abrasion above his right eye and some eventual bruising on his right eye and cheekbone area. It further appears that these injuries had resolved by January 10, 2013, because Dr. Miller makes no mention of them. (Plaintiff's Exhibit No. 4, Docket Item No. 98-4.) While I am persuaded that Rivera likely suffered some

discomfort caused by these injuries, I am not persuaded that this incident or his injuries have resulted in the continuing pain or the emotional problems that he claims.

## PROPOSED FINDINGS OF FACTS AND
## CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The defendants used excessive force on Rivera on December 28, 2012, when they struck him in the head and pushed him to the floor for no reason; and

2. The plaintiff suffered a knot to his head, an abrasion to his right eyebrow area and bruising to his right eye and cheekbone area as a result of this use of excessive force.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend the court enter judgment in the plaintiff's favor in the amount of $500.00 for compensatory damages and costs. I do not recommend that the court award any punitive damages.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written

objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: February 29, 2016.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE